## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **ALEJANDRO MUTUC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. _____** |
| **DISA GLOBAL SOLUTIONS, INC.,** | § | |
| **and UNIVERSITY MRO, LLC d/b/a** | § | |
| **UNIVERSITY SERVICES and** | § | |
| **UNIVERSITY SERVICES – MRO,** | § | |
| **.,** | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES, Plaintiff, **ALEJANDRO MUTUC** (hereinafter "Mr. Mutuc" or "Plaintiff"), in the above-referenced matter, complaining of and about Defendants, DISA Global Solutions, Inc. (hereinafter "DISA" or "Defendant"), University MRO, LLC d/b/a University Services and University Services – MRO for causes of action files this Plaintiff's First Amended Petition, showing to the Court the following:

### I.     PARTIES AND SERVICE

1.     Plaintiff, **ALEJANDRO MUTUC**, is an individual residing in California at the time the cause of actions accrued.

2.     Defendant, **DISA GLOBAL SOLUTIONS, INC**. ("DISA"), is a Delaware Corporation doing business in Texas with its principal place of business at 12600 Northborough Dr. Houston,

Texas 77067, and it may receive service of process by and through CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

3.      Defendant, **UNIVERSITY MRO, LLC d/b/a UNIVERSITY SERVICES and UNIVERSITY SERVICES - MRO** ("University Services"), is a Delaware Corporation doing business in Texas, with its principal place of business at 12600 Northborough Dr. Houston, Texas 77067 and it may receive service of process by and through The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## II.      JURISDICTION AND VENUE

4.      This Court has jurisdiction of this action as this case arises under 15 U.S.C. § 1681 and the damages are within the jurisdiction of this court and will continue to increase as this case proceeds to trial. Venue is proper in the Southern District of Texas – Houston Division, pursuant to the Federal Rules of Civil Procedure, as all or a substantial part of the events or omissions giving rise to this claim occurred in this this District.

## III.      NATURE OF ACTION

5.      This is an action brought pursuant to 15 U.S.C. § 1681 to correct and recover for Defendants' unlawful reporting practices related to a false positive hair follicle drug test that have an adverse effect on upon Plaintiff's ability to obtain employment.

6.      Defendants' use of the hair follicle test is unlawful because, among other reasons, it is used despite the availability of alternative testing methods and procedures that would have less disparate, adverse, and discriminatory impact and higher accuracy (with less false positive tests).

7.      Scientific studies demonstrate that the procedures used by the Defendants to test hair samples for the presence of illegal drugs are flawed, imprecise, arbitrary, unreliable, and inherently

biased against people of color and Defendants have conspired to adversely affect Plaintiff and similarly situated employees of color.

## IV.    FACTS

**DISA's POLICIES and KNOWLEDGE**

8.    DISA advertises that its "Drug Testing combines technology and screening innovations to deliver employee information quickly and accurately. DISA specializes in giving employers the tools and information they need to make the most informed hiring decisions possible. DISA's provides information to employers like Total Safety and Clean Harbors, in making employment retention, hiring and termination decisions based upon drug test reports created by DISA.

9.    DISA advertises that "With DISA, employers can manage all their hiring and employee screening requirements under one comprehensive service umbrella. Regardless of their industry or unique policy requirements, DISA' s solutions make it easier for employers to hire the right people for the job and to manage their business more efficiently."

10.    DISA, however, has no policy to deal with errors in sample collection or when a sample might have been contaminated. DISA will not allow for a new sample to be taken, instead will only    allow    for    retesting    of    the    same    tainted    sample    at    the    same    lab: (https://disaglobalsolutions.formstack.com/forms/rtd_reanalysis_request).

11.    Additionally, DISA states that an employee who tests positive must either be terminated immediately or, if a company allows it, to be given a return-to-duty process administered by none other than DISA: If one of your employees fails a drug screen and they are in a safety-sensitive position, they must be removed from duty immediately. If the employee is not in a safety-sensitive position, then disciplinary actions can vary based on company policy. Some employers offer Return-to-Duty testing which is given after an employee has violated a company's drug and alcohol

policy and gives the employee an opportunity to get healthy and return to work. Before returning to the company drug testing program, the employee must follow through with the Return-to-Duty process, which can vary by company and industry specifications. Employees in a DISA mandated drug and alcohol testing program that are interested in going through DISA's 'return-to-duty' process can visit https://disa.com/rtd." The Return-to-Duty testing and classes provided by DISA require employees to admit "drug use" even if the test resulted in a false positive.

12.    DISA does not conduct the testing itself, instead it contracts out to third-party specimen collection sites and laboratories to do that work. With the Plaintiff's testing, DISA instructed him to go to a collection facility for the taking of the hair follicle sample. DISA, in turn, uses PSYCHEMEDICS as the laboratory to actually test the hair follicle taken.

## UNIVERSITY SERVICES ALLEGED SERVICES – THIRD-PARTY AFFILIATE OF DISA

13.    According to University Services:

"University Services provides Medical Review Officer (MRO) services for drug testing results. Our MROs are licensed physicians, certified as MROs. As the MRO, we act as a gatekeeper in the drug testing process, advocating for the integrity of drug testing programs. We receive results from the lab, review and interpret the lab results, explore valid medical explanations for non-negative results by interviewing donors, verify the results and report the final result determinations to clients (employers, third-party administrators (TPAs) and other agencies such as correction facilities and court-ordered testing). University Services provides expert MRO services for clients nationwide for both regulated and nonregulated testing programs. We have a team of 12 MROs that work with the MRO staff to ensure quality result reporting with the best possible turn-around time."

14.    Interestingly, third-parties administers the entire drug testing process and DISA deals with the administration of the tests and picks the lab, is also located at the same address in Texas as University Services that verifies and allegedly double-checks the results for accuracy.

15.     Of course, although advertising it "ensures a quality result" fails to do any of the actual verification when, in a circumstance like the one here, a clearly false positive results in an employee termination.

16.     Plaintiff Alejandro Mutuc is a Petroleum Inspector with extensive experience in the oil and gas industry, where he has consistently met and exceeded drug-free workplace standards.

17.     During his employment with Bureau Veritas and other employers, Plaintiff was subjected to numerous drug tests—including urine, swab, and hair follicle testing—and reliably tested negative on every occasion until DISA Global Solutions ("DISA") reported an alleged positive result for methamphetamine based solely on a hair follicle test conducted in August 2024.

18.     The test administered by DISA contradicted Plaintiff's consistent history of negative drug tests, including random screenings and a pre-employment panel, as well as an independent urine test ordered by his primary physician, which returned negative just days after the false positive.

19.     Plaintiff was immediately terminated from his position with Bureau Veritas on September 13, 2024, based solely on the false report communicated by DISA, which branded him as a methamphetamine user. Plaintiff had never used illegal substances in his life.

20.     Plaintiff's attempts to engage DISA to review or reassess the test were met with silence and indifference, despite his submission of medical documentation, retesting results, and evidence of a likely false positive triggered by his prescribed use of Sildenafil—a medication taken under the supervision of a physician since 2021.

21.     As a result of DISA's inaccurate and irresponsible reporting, Plaintiff was forced to undergo a "Return to Duty" rehabilitation program, despite maintaining complete sobriety. The stigma and consequences of the false result continue to harm his career and reputation in the refinery and inspection industry.

22.     In conjunction with his pre-employment drug testing with Bureau Veritas for his job in Texas, the Plaintiff was assigned by DISA to have a hair sample taken in Cordelia, California.

23.     The hair taken was body hair from the Plaintiff's arm on Sept 9, 2024, on leg hair.

24.     The sample was sent to a Psychemedics lab in California where it was thereafter tested on Sept 9, 2024. The result was a positive for Methamphetamine / LEVELs "i.e. at 16.5 ng/l0mg.", whereas the cutoff for a negative was 5ng/l 0mg. The test was confirmed positive and by the MRO at University Services and was released to the Plaintiff.

25.     Plaintiff was informed of the positive result. He got a call from his manager and was told he would be terminated based on the drug test result, which was positive.

26.     When DISA refused to accept the initial test results as negative, Plaintiff inquired whether a new test could be conducted, expressing concern that the medication he was taking—Sildenafil— might have caused a false positive. Despite this request, DISA declined to allow a new sample to be provided and instead offered to retest the original, potentially contaminated, sample for a fee of $180.25. Ultimately, DISA was unable to perform the retest. As a result of this negligence and failure by DISA's agents to follow established protocols, Plaintiff was wrongfully entered into both the DISA national drug testing database and the Psychemedics drug testing database.

27.     The negative test was also reviewed by an MRO (other than DISA's captive MRO, University Services).

28.     Because DISA refused to conduct a retest, permit the submission of a new sample, or acknowledge the possibility of a false positive, Bureau Veritas was left with no choice but to terminate Plaintiff's employment. Additionally, Plaintiff has been effectively barred from securing employment with any company that utilizes DISA's drug screening services, as DISA has wrongfully designated him as a drug user based on a false positive result. This constitutes a

continuing harm. As a direct consequence, Plaintiff not only lost his position at Bureau Veritas, but also had a job offer from Bureau Veritas rescinded. Since DISA holds a dominant position in drug testing within the energy sector, Plaintiff has been blacklisted from obtaining comparable employment in his field.

29.    On information of belief, the Defendants did not take precautions recognized as necessary to avoid contamination with respect to the collection of the hair sample from Plaintiff, including as to the use of sterile razor blades and gloves. It is possible to be subjected to incidental exposure to some illegal drugs, without ingesting the drug. It is possible to test positive for some illegal drugs without having ingested the drug or even having had incidental exposure.

30.    Defendants necessarily knew that the scientific veracity of hair follicle tests for illegal drugs is in doubt because of concerns that hair tests deliver a higher rate of false positives for individuals with higher concentrations of melanin in their hair because melanin acts as a major binding site.

31.    For the purposes· of compliance with federal regulations, including those promulgated by the Department of Transportation, hair sample tests have not been approved by the United States Department of Health and Human Services as a part of any regimen of drug testing for illegal drugs.

32.    For the purposes of compliance with federal regulations, urinalysis is the only method of testing for illegal drugs approved by the United States Department of Health and Human Services.

33.    Defendants were under no legal obligation to offer hair sample tests to third party employers wishing to retain their services for the purposes of screening employees for illegal drugs. A urinalysis was, and indeed, ought to have been, sufficient in making a determination regarding any illegal drug use by Plaintiff.

7

34.    The first false hair sample drug test and the refusals to retest with a new sample, even given indisputable and admitted knowledge that the sample was giving a false positive was the proximate cause of Plaintiff's termination. DISA maintains the final decision whether to accept results or reject results. Despite having information in its possession that refuted the first test result, the most DISA offered was the promise of retesting the original sample.

35.    Plaintiff has completed counseling commensurate with that required by DISA to meet the prerequisites for restoration of his status to be cleared for work and be removed from the consumer database keeping him from being employed at his trade.

36.    Due to the Plaintiff's loss of employment as a result of the false positive hair sample drug test and refusal to remedy the known false positive, has caused significant harm, including emotional distress and mental anguish. This situation has been life-altering, leading to severe mental, physical, and emotional distress. Plaintiff has suffered lost compensation and benefits and has also suffered compensatory damages.

37.    Through *res ipsa loquitur*, we know that either the sample was tainted, or the lab committed error. Given the retesting of the original sample, it is believed that this indicates the sample itself was tainted on taking or in the chain of custody among the Defendants.

38.    The Defendants acted in concert in the performance of this improper and tortious activity. Based on the nature and effect of Defendants' conduct, punitive damages are also appropriate.

39.    DISA is a "consumer reporting agency" as defined by 15 U.S.C. 1681(a) because it is in the practice of assembling or evaluating information on consumers for the purpose of furnishing consumer reports to third parties. The consumer report supplied by DISA contained information which was a matter of public record and of the type of information that was likely to have an

adverse effect upon Plaintiff's ability to obtain employment generally, and specifically with Total Safety, Clean Harbors, and many employers who contract with DISA.

40.    DISA contracts with other Defendants to supply "consumer reports" as defined by 15 U.S.C. § 1681a(d) for employment purposes. A "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (B) employment purposes. DISA reports are deemed "consumer reports" as defined by 15 U.S.C. §1681(a)(d)(B) because they are written reports of information bearing on Plaintiff's character, general reputation, and personal characteristics.

41.    Defendant has been reporting, and did here report, derogatory and inaccurate statements and information relating to Plaintiff to third parties ("inaccurate information"). DISA relies information from third-party testing sites to produce its report that the hair follicle test was and their reports were not based upon their experiences in testing the sample, but upon any outside information from third-parties. DISA sends employees to third party sites for testing and reports the results from the third-party test results therefore, the reports are not governed by the exclusion under § 1681a(d)(A) which requires that excluded reports contain "solely" information about "transactions or experiences between the consumer and the person making the report."

42.    The inaccurate information includes, but is not limited to, false positive drug test results from an unreliable hair follicle test, which DISA failed to maintain strict procedures to assure maximum possible accuracy. The inaccurate information grossly disparages the Plaintiff and portrays him as a methamphetamine user, which he is not, and evidence will demonstrate. There

is perhaps no greater error that a consumer reporting agency can make because it continues to adversely affect Plaintiff's ability to find employment with DISA holding such a large market in the oil and gas industry.

43.     In creating and furnishing Plaintiff's consumer report, DISA failed to follow reasonable procedures to assure the maximum possible accuracy of the information it reported about the Plaintiff. DISA's consumer report consists of its third-party information gathered from outside sources, like University MRO and Psychemedics lab.

44.     Defendant sold Total Safety, Clean Harbors, and many of Plaintiff's prospective employers a consumer report that contained the inaccurate information. Plaintiff was subsequently terminated from Total Safety, and Plaintiff was informed that his offer was revoked by Clean Harbors because of the inclusion of the inaccurate drug test information on Defendant's consumer report, that the inaccurate information was a substantial factor for the denial.

45.     Defendant DISA fraudulently represented the results of its testing as scientifically accurate, reliable, and valid, despite failing to conduct confirmatory testing, disclose the risk of false positives from prescription medications, or consider Plaintiff's full testing history and medical information.

46.     DISA knew or should have known that Sildenafil and other medications could interfere with hair follicle drug testing, but failed to disclose such risks to Plaintiff or his employer. This omission constituted both fraudulent concealment and negligent misrepresentation.

47.     Plaintiff conducted his own controlled tests—abstaining from Sildenafil and receiving a negative hair follicle result in December 2024, and subsequently reintroducing Sildenafil before testing positive again in February 2025. This pattern proved the false positive was attributable to a known cross-reactivity, which DISA disregarded.

48.     Despite Plaintiff's efforts to contact the FDA, Pfizer, and Viatris to understand the chemical interference, DISA never engaged in dialogue, never requested further information, and refused to take corrective action. This total disregard of investigative diligence evidences gross negligence and willful misconduct.

49.     DISA's communications to third parties—specifically to Bureau Veritas and others in the oil and gas sector—were made without privilege, without reasonable basis, and with full knowledge that the report would result in Plaintiff's termination, blacklisting, and reputational destruction in a highly regulated industry.

50.     These actions constituted tortious interference with prospective economic advantage, as DISA's knowingly false report caused Plaintiff's termination and made future employment in the refinery sector extremely difficult, if not impossible.

51.     DISA's conduct was not only individually wrongful, but arose from a systemic failure in its testing protocols, a refusal to implement quality control mechanisms, and a pattern of indifference to individuals harmed by inaccurate testing. On information and belief, this is not an isolated event, and Defendant has routinely ignored legitimate challenges to flawed testing practices.

52.     Plaintiff alleges that DISA's conduct involved reckless and malicious disregard for his rights and future, and may include conspiratorial silence and alignment with employers to prioritize efficiency over accuracy, knowingly sacrificing individual reputations and employment without due process or follow-up.

53.     As a direct and proximate result of Defendant's fraud, misrepresentations, tortious acts, and indifference, Plaintiff has lost income, career opportunities, and suffered severe emotional and psychological harm.

54.    As of result of Defendant's conduct, Plaintiff has suffered actual damages in the form of lost employment opportunities, harm to reputation, and emotional distress, including humiliation and embarrassment.

55.    At all times pertinent hereto, Defendants were acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

56.    At all times pertinent hereto, the conduct of the Defendant, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

## V.    CAUSES OF ACTION

### COUNT 1 – VIOLATIONS OF THE FCRA
#### (Against Defendant DISA)

57.    Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

58.    At all times pertinent hereto, Defendant DISA is a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f)."

59.    At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c) because Plaintiff is an individual.

60.    At all times pertinent hereto, the above-mentioned drug test reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d)(1)(B) because DISA's reports ar written communication bearing information on a consumers, character, general reputation, or personal characteristics.

61.    DISA is a "consumer reporting agency" as defined by 15 U.S.C. 1681(a) because it is in the practice of assembling or evaluating information on consumers for the purpose of furnishing consumer reports to third parties. The consumer report supplied by DISA contained information which was a matter of public record and of the type of information that was likely to have an adverse effect upon Plaintiff's ability to obtain employment generally, and specifically with Total Safety, Clean Harbors, and many employers who contract with DISA.

62.    Pursuant to 15 U.S.C. § 1681(n) and 15 U.S.C. § 1681(o), Defendant DISA is liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency of information pursuant to 15 U.S.C. § 1681e(b), which states:

> **(b) Accuracy of report**: Whenever a consumer reporting agency prepares a consumer report it shall <u>follow reasonable procedures to assure maximum possible accuracy of the information</u> concerning the individual about whom the report relates.

63.    It is well known that hair follicle drug test are the **least** accurate drug test administered and generally produces more false positive test results than any other testing, including urinalysis testing.

64.    The conduct of Defendant DISA was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to the Plaintiff that are outlined more fully above and, as a result, Defendant is liable to the Plaintiff for the full amount of statutory, actual, and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

65.    Generally, the FCRA provides a private right of action against any person who negligently or willfully fails to comply with the statute. *See Id.* §§ 1681n, 1681o. "To assert a violation of the

FCRA, a plaintiff must allege (1) that there was a 'consumer report,' (2) that defendant used or obtained the report (3) without a permissible purpose, and (4) that defendant acted negligently or willfully." *See Cunningham v. Nationwide Sec. Sols., Inc.*, No. 3:17-CV-00337-M, 2017 WL 10486988, at *4 (N.D. Tex. Nov. 2, 2017).

66.    DISA released a consumer report of information regarding Plaintiff's alleged drug use and Defendant used that information for employment purposes, and that he was not hired or terminated by Defendants because of the false positive hair follicle test.

67.    Under § 1681b(b)(2), "a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and (ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person." 15 U.S.C. § 1681b(b)(2)(A).

68.    Section 1681b(b)(3) states, in relevant part:

> [I]n using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates: (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under the FCRA…

69.    Section 1681m(a) provides that "[i]f any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, " the person shall notify the consumer that an adverse decision was made as a result of the report

and must provide, among other things, the contact information of the consumer reporting agency and the right to dispute the accuracy or completeness of the report. *Id.* § 1681m(a). Under the FCRA, an "adverse action" includes "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee." *Id.* § 1681a(k)(1)(B)(ii).

70.    Plaintiff asserts it suffered damages Section 15 U.S.C. §1681(n) given that Defendant DISA willfully prepared consumer reports without following or creating reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. DISA prepared consumer reports with knowledge or reckless disregard to the truth that the hair follicle tests repeatedly produced more false positive drug tests and its consumer reports were based on procedures to assure maximum possible accuracy, yet DISA continued to prepare reports from third-parties that employees, like Plaintiff, tested positive, when the result was actually a "false positive."

71.    Plaintiff asserts it suffered damages Section 15 U.S.C. §1681(o) given that Defendant DISA negligently prepared consumer reports without following or creating reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. DISA prepared consumer reports with negligently when it should have known the hair follicle tests repeatedly produced more false positive drug test and its consumer reports were based on procedures to assure maximum possible accuracy, yet DISA continued to prepare reports from third-parties that employees, like Plaintiff, tested positive, when the result was actually a "false positive.

## COUNT 2 – FRAUD
### (Against Defendant DISA and Defendant University MRO)

72.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

73.     Under California law, the elements of fraud (intentional misrepresentation) are:

1) misrepresentation (false representation, concealment, or nondisclosure),

2) knowledge of falsity,

3) intent to induce reliance,

4) justifiable reliance, and

5) resulting damages. *(Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638; *Civ. Code §§ 1572, 1709, 1710).*

**A.  <u>False Representation and Concealment:</u>**

74.     Defendants DISA and University MRO, jointly and severally, made false representations of material fact when they reported that Plaintiff Alejandro Mutuc had tested positive for methamphetamine through a hair follicle drug test administered in or around August 2024.

75.     Defendants expressly or impliedly represented that the test was reliable, scientifically accurate, and indicative of actual methamphetamine use. They further represented that the result had been confirmed, vetted, and that Plaintiff had indeed violated substance policies.

76.     These statements were false. Plaintiff had no history of illicit drug use and had passed multiple drug tests before and after the DISA-administered test—including urine and follicle tests. Additionally, he submitted independent medical evidence, including a physician-ordered urine test and follow-up follicle testing, all of which were negative.

77.     Defendants also fraudulently concealed material facts. Specifically, they failed to disclose:

- That Sildenafil, a medication lawfully prescribed to Plaintiff, could interfere with testing and create false positives;

- That hair follicle testing is scientifically controversial in detecting recent or low-level drug exposure;

- That no confirmatory GC/MS or independent laboratory verification was offered or performed;

- That the "positive" result lacked proper chain-of-custody documentation or interpretation by an independent toxicologist;

    And that Plaintiff had a documented pattern of negative results inconsistent with the alleged outcome.

### B. **Knowledge of Falsity and Intent to Deceive:**

78.    At all times relevant, Defendants knew or should have known that the hair follicle result was uncorroborated, medically unsupported, and in conflict with the overwhelming objective data provided by Plaintiff and his healthcare providers.

79.    Defendants also knew, or were willfully blind to the fact, that their report would be relied upon by Plaintiff's employer and future employers and would cause serious adverse consequences to Plaintiff, including termination and reputational ruin.

80.    Defendants' intent to induce reliance is evidenced by their affirmative communication of the test result to Plaintiff's employer, their failure to qualify the test result or investigate further, and their refusal to amend, retract, or clarify their report even after being provided with proof of false positivity and pharmacological cause.

### C. **Justifiable Reliance and Damage:**

81.     Plaintiff justifiably relied on the expectation that Defendants would follow standard protocols for medical review and toxicological verification before making a career-ending accusation of drug use.

82.     Plaintiff also justifiably relied on the belief that DISA and University MRO were competent, unbiased, and operating in accordance with the scientific and ethical standards required of their industry.

83.     As a direct and proximate result of Defendants' fraudulent conduct:

- Plaintiff was terminated from employment on or about September 13, 2024;

- He was compelled to complete a Return to Duty rehabilitation program to regain limited industry access;

- He suffered severe economic loss, including lost wages, opportunities, and diminished future employability;

- He endured emotional distress, public shame, and ongoing harm to his professional and personal reputation.

**D.  Punitive Damages:**

84.     Pursuant to Civil Code § 3294, Plaintiff is entitled to exemplary and punitive damages because Defendants acted with fraud, oppression, and malice. Their conduct showed a reckless disregard for the truth, for Plaintiff's legal rights, and for the foreseeable harm that their misrepresentations would cause.

## COUNT 3 – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (Against Defendant DISA and Defendant University MRO)

85.     Plaintiff incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

86.     Under California law, intentional interference with prospective economic relations requires the plaintiff to plead and prove:

1)  an economic relationship between the plaintiff and a third party with the probability of future economic benefit;

2)  defendant's knowledge of that relationship;

3)  intentional acts by the defendant designed to disrupt that relationship;

4)  actual disruption of the relationship; and

5)  economic harm to the plaintiff proximately caused by the defendant's wrongful acts.

(*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153; *PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368.)

**A.  <u>Plaintiff's Employment and Industry Relationships:</u>**

87.     Plaintiff Alejandro Mutuc was employed by Bureau Veritas as a Petroleum Inspector. He also had a long-standing professional presence in the refinery and inspection industry, and maintained active employment relationships and prospective opportunities in the petroleum sector.

88.     Given the highly regulated nature of the industry, continued employment and advancement were dependent on maintaining a clean drug testing record, industry certifications, and professional reputation.

89.     Plaintiff had successfully passed all drug tests throughout the course of his employment and was a candidate for continued work and future assignments with Bureau Veritas and other contractors in the sector.

**B.  <u>Knowledge of the Relationship and Intent to Disrupt:</u>**

19

90.    Defendants DISA and University MRO knew, or should have known, that their reporting of a positive drug test would automatically trigger adverse action, including immediate termination and blacklisting in the refinery industry.

91.    Defendants also knew that Plaintiff's ability to work, obtain new employment, or maintain eligibility for project assignments was contingent upon accurate, valid drug screening data.

92.    Despite having this knowledge, Defendants:

    a.  Reported a false and unverified positive result for methamphetamine without confirming the outcome or conducting adequate review;

    b.  Ignored multiple communications and supporting documentation from Plaintiff, including medical records, physician testimony, and independent negative test results;

    c.  Refused to clarify, correct, or retract their findings when given irrefutable evidence of error; and

    d.  Knew that their inaction and silence would result in Plaintiff's termination and future unemployability.

**C.  <u>Disruption and Harm:</u>**

93.    As a direct result of Defendants' intentional acts, Plaintiff was:

    a.  Terminated by Bureau Veritas on or about September 13, 2024;

    b.  Required to undergo a humiliating Return to Duty program despite being sober and drug-free;

    c.  Blacklisted from numerous projects, including assignments that required a clean DISA record;

    d.  Denied future job opportunities in a highly specialized field due to the tainted drug test in the DISA system.

94.    Defendants' conduct was unjustified, malicious, and in reckless disregard of Plaintiff's rights, carried out without legitimate business purpose and with full awareness of the likely consequences to Plaintiff's livelihood and reputation.

**D.  Legal Wrongfulness:**

95.    Defendants' conduct was independently wrongful and actionable under established legal principles, including:

- Misrepresenting factual information about a regulated drug test;

- Failing to follow industry best practices for confirmatory testing;

- Disregarding objective contradictory evidence; and

- Violating Plaintiff's right to fair process and good faith investigation in the reporting of reputationally damaging results.

(*See Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393: "[A]n act must be wrongful by some legal measure other than the fact of interference itself.")

**E.  Damages:**

96.    As a result of Defendants' tortious interference, Plaintiff has suffered:

- Loss of employment and earnings (past and future);

- Diminished reputation in the refinery and oil inspection industry;

- Ineligibility for future work under the DISA system;

- Severe emotional distress, anxiety, and reputational injury.

97.    Plaintiff is entitled to compensatory damages, as well as punitive damages under Civil Code § 3294, due to Defendants' oppressive and malicious conduct.

**COUNT 4 – BREACH OF RESTATEMENT SECOND OF TORTS § 552**
**(Against Defendant DISA and Defendant University MRO)**

98.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

99.    This cause of action arises under the principles set forth in Restatement (Second) of Torts § 552, which California courts have adopted and applied to cases involving negligent misrepresentation in the context of professional services.

(*See Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 408; *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1082.)

### A. Legal Standard Under § 552:

100.    Under Restatement (Second) of Torts § 552(1), a party is liable for pecuniary loss caused to a third party by negligent misrepresentation if:

1)    "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions,

2)    is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information,

3)    if he fails to exercise reasonable care or competence in obtaining or communicating the information."

101.    California courts recognize this doctrine as creating a limited duty to non-contracting parties when the supplier of information intends or knows that the information will be used in a specific transaction and that the plaintiff will rely on it (*Bily, supra,* at 408; *Randi W.,* supra).

### B.  Defendants' Negligent Provision of Information:

102.    Defendants DISA and University MRO are entities engaged in the business of supplying drug test results for purposes of employment decisions, particularly in the highly regulated refinery and petroleum sectors. They derive pecuniary benefit from these services.

103.    The information provided by Defendants was factually and scientifically inaccurate, as later confirmed by:

      a.  Plaintiff's negative urine test administered days after the alleged positive;

      b.  A clean hair follicle test in December 2024 after abstaining from Sildenafil; and

      c.  A return of false positive in February 2025 after reintroducing Sildenafil.

104.    Defendants knew or should have known that Plaintiff's continued employment and industry eligibility depended on the accuracy of this information, and that the test result would be relied upon by employers, industry consortia, and future contractors.

### C.  Failure to Exercise Reasonable Care:

105.    Defendants failed to **exercise reasonable care or competence** in several ways, including but not limited to:

      a.  Failing to verify the test result with a confirmatory GC/MS analysis or independent toxicologist;

      b.  Ignoring known limitations and false positive risks associated with hair follicle testing, particularly with respect to prescription drugs like **Sildenafil**;

      c.  Failing to follow up when confronted with contradictory medical evidence;

      d.  Neglecting their duty as professional service providers to advise the employer of possible error or mitigation factors.

106.    No effort was made to contextualize or update the report, and Defendants maintained the erroneous record despite Plaintiff's extensive documentation, test results, and physician statements—all of which discredited the initial report.

**D.  Justifiable Reliance and Damages:**

107.    Plaintiff's employer and potential future employers justifiably relied on Defendants' report in making hiring and termination decisions. DISA's reports are used industry-wide for employment vetting and access authorization.

108.    As a direct and proximate result of Defendants' breach of their professional and statutory duties under § 552:

- Plaintiff was terminated from his employment;

- He was blacklisted from future opportunities within the industry;

- He was financially harmed through loss of wages and future earning potential;

- He suffered emotional and reputational injury that continues to this day.

**E.  Entitlement to Relief:**

109.    Plaintiff is entitled to compensatory damages for the economic and personal harm suffered as a result of Defendants' negligence in supplying and failing to correct false information.

110.    Plaintiff further requests punitive damages under Civil Code § 3294 due to Defendants' grossly reckless disregard for the accuracy of their services and the foreseeable impact on Plaintiff's livelihood and dignity.

**COUNT 5 – DEFAMATION**
**(Against Defendant DISA)**

111.    Plaintiff realleges and incorporates by reference all prior paragraphs as though fully set forth herein.

112.    Defendant DISA Global Solutions, Inc. ("DISA") made and published false and defamatory statements about Plaintiff Alejandro Mutuc, including the assertion that he tested positive for methamphetamine use in connection with a hair follicle drug test conducted in or about August 2024.

113.    These statements were communicated to third parties, including but not limited to Plaintiff's employer, Bureau Veritas, and became part of Plaintiff's DISA record, which is accessible to future employers in the highly regulated oil and gas industry.

### A.  Legal Basis for Defamation Under California Law:

114.    Under California law, defamation includes both libel and slander, which are defined as follows:

- Libel is a false and unprivileged publication by writing or other fixed representation that exposes a person to hatred, contempt, or ridicule, or has a tendency to injure them in their occupation. (*Cal. Civ. Code § 45*)

- Slander is a false and unprivileged oral communication that similarly causes reputational harm. (*Cal. Civ. Code § 46*)

115.    To state a claim for defamation, a plaintiff must show:

- A false statement of fact;

- That was published to a third party without privilege or authorization;

- With at least negligence as to its truth or falsity;

- Causing damage to the plaintiff's reputation or livelihood. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.)

### B.  False Statements of Fact:

116.    Defendant falsely stated and/or implied that Plaintiff had used illicit drugs—specifically, methamphetamine—based on a single hair follicle drug test. This assertion was factually false, and Defendant either knew or should have known it was false when it was made.

117.    DISA failed to perform appropriate confirmatory testing, failed to consult with Plaintiff or his physician, and failed to consider contradictory evidence including:

- A negative urine test conducted immediately after the alleged positive;

- Multiple prior negative random drug tests;

- A December 2024 negative follicle test after cessation of Sildenafil use;

- A February 2025 positive follicle test following resumed use of Sildenafil.

118.    Despite this evidence, Defendant continued to publish the defamatory result and failed to retract or annotate the record in any way.

## C. **Unprivileged Publication to Third Parties:**

119.    DISA published the false result to Plaintiff's employer, Bureau Veritas, with the knowledge and intent that it would be relied upon for employment decisions.

120.    This communication was not protected by any absolute or qualified privilege under California law, as it was made:

- With negligence or reckless disregard for the truth;

- In a context where Plaintiff was not afforded any opportunity to be heard or dispute the result before termination;

- In violation of industry standards of care for drug testing providers.

121.    Additionally, DISA maintains a record system that broadcasts this false test result to prospective employers and industry databases, resulting in ongoing reputational harm and loss of job opportunities.

### D.  **Injury to Reputation and Presumed Damages:**

122.    The false statement was defamatory per se under California law, as it:

- Imputes criminal behavior (illegal drug use);

- Implies dishonesty or moral turpitude;

- Injures Plaintiff in his occupation as a refinery professional.

123.    Because the statement was defamatory per se, general damages to Plaintiff's reputation are presumed by law. (*See *Washer v. Bank of America* (1943) 21 Cal.2d 822, 827; *Contento v. Mitchell* (1972) 28 Cal.App.3d 356.)

124.    Nonetheless, Plaintiff has also suffered actual damages, including:

- Loss of employment;

- Blacklisting from the petroleum and inspection industry;

- Emotional distress and humiliation;

- Substantial loss of earnings and future employment prospects.

### E.  **Malice and Entitlement to Punitive Damages:**

125.    DISA's conduct was undertaken with actual malice—defined as knowledge of falsity or reckless disregard for the truth. (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254; *Civ. Code § 3294*).

126.    Plaintiff repeatedly notified DISA of the false result, provided independent medical evidence, and identified the likely cause (Sildenafil), yet DISA failed to investigate, correct, or even acknowledge the dispute.

127.    Accordingly, Plaintiff is entitled to recover punitive and exemplary damages in an amount sufficient to punish and deter such conduct.

## VI.    JURY DEMAND

128.    Plaintiff demands a jury on all issues to be tried in this matter. Plaintiff submits the jury

demand and herein submits the jury fee.

## VII.    PRAYER

129.    WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to

appear and answer herein, and that on final trial, Plaintiff have judgment against Defendant for:

   a.   All damages to which Plaintiff may be entitled pursuant to this Amended Petition,
        including backpay and front pay;

   b.   Compensatory damages, including, but not limited to mental anguish;

   c.   Punitive damages;

   d.   Reasonable attorneys' fees, as allowed by law (with conditional awards in the event
        of appeal);

   e.   Pre-judgment interest at the highest rate permitted by law;

   f.   Post-judgment interest from the judgment until paid at the highest rate permitted
        by law;

   g.   Costs of Court; and

   h.   Such other and further relief, at law or in equity, to which Plaintiff may be entitled,
        whether by this Original Petition or by any proper amendments thereto.

Respectfully Submitted,



_____

**Alfonso Kennard Jr.**
Texas Bar No.: 24036888
Alfonso.Kennard@kennardlaw.com

28

**Eddie Hodges, Jr**.
Texas Bar No. 24116523
eddie.hodges@kennardlaw.com
filings@kennardlaw.com
5120 Woodway Dr., Suite 10010
Houston Texas 77056
(713) 742 -0900 (main)
(832) 558 -9412 (facsimile)
(832) 558-6670 (Facsimile)
**ATTORNEYS FOR PLAINTIFF**